UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AAA GAMING LLC and<br>ILLINOIS GAMING INVESTMENTS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>MIDWEST ELECTRONICS GAMING, LLC,<br><br>Defendant. | No. 16 CV 4997<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs sold to defendant Midwest Electronics Gaming, LLC, the rights to install gaming equipment in certain restaurants and other businesses. The parties almost immediately found themselves in a dispute when Midwest withheld payments due under the contracts because some of those rights appeared to be invalid. The parties resolved the dispute later that year by entering into a settlement agreement, which provided for an ongoing relationship and payment scheme. But Midwest has again stopped paying plaintiffs, raising some of the same issues that the parties had previous settled. Plaintiffs bring claims of breach of the settlement agreement (Count I) and breach of the duty of good faith and fair dealing implied in that agreement (Count II). They also seek to enforce the agreement's accelerated payment provision (Count III).

Midwest seeks dismissal of all of plaintiffs' claims. It argues that Illinois law and public policy mandates dismissal, because plaintiffs seek to enforce unlawful gambling contracts. It also says that plaintiffs' cause of action for breach of implied

duty of good faith and fair dealing is not recognized in Illinois, and that the accelerated payments provision that plaintiffs seek to enforce in Count III of the complaint is an unenforceable penalty clause. For the following reasons, Midwest's motion is granted.

I.   **Legal Standards**

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). To survive a motion to dismiss, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A document that is attached to a pleading "is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). Thus, when ruling on a Rule 12(b)(6) motion to dismiss, a court must "consider documents attached to the complaint as part of the complaint itself." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (citing *Int'l Mktg., Ltd. v. Archer–Daniels–Midland Co.*, 192 F.3d 724, 729 (7th Cir. 1999)).

II.  **Facts**

Plaintiff AAA Gaming LLC consists of members Nicky L. Nichols, Bennie F. Relan, John J. Koehler, Jess P. Koehler, and the Koehler 2009 Irrevocable Trust

F/B/O/ James P. Koehler and Family, whose trustee is James P. Koehler. [1] ¶¶ 7, 12.[1] Nichols and the trust also comprise the membership of plaintiff Illinois Gaming Investments, LLC. [1] ¶ 8. Together, plaintiffs held a collection of exclusive location agreements purporting to give them exclusive rights to operate video gaming terminals at 316 bars, restaurants, and other establishments, once those establishments become licensed and approved by the Illinois Gaming Board. [1] ¶¶ 20–21.

On July 18, 2012, plaintiffs entered into two asset purchase agreements—one for AAA and one for Illinois Gaming—with defendant Midwest Electronics Gaming, LLC, whose sole member is Timothy Scott Jones. [1] ¶¶ 14, 20, 21. Midwest is a "licensed terminal operator," approved by the Illinois Gaming Board to operate video gaming terminals at licensed establishments. [1] ¶ 19. Under the purchase agreements, plaintiffs assigned to Midwest its rights under the exclusive location agreements with the bars and restaurants. [1] ¶¶ 20–21. In return, Midwest agreed to pay plaintiffs sums of money at and shortly after closing, and to make a series of payments in the future, the amount and timing of which would depend on the occurrence of certain events. [1] ¶¶ 43–50, 52–53, 56–67. Those events include the licensing of an establishment and municipal approval of the use of video gaming terminals. [1] ¶ 56. The agreements also provided that in an Event of Default, which occurs if Midwest misses a payment and fails to make that payment within ten days of written notice, Midwest would have to pay plaintiffs an amount equal to

---

[1] Bracketed numbers refer to entries on the district court docket.

all of the future payments that would be owed on the contract if every establishment became licensed. [1] ¶¶ 68–69, 133.

By December, Midwest had fallen behind in its payments, and the parties disagreed over the amounts owed. [1] ¶¶ 70-71. Midwest refused to pay, because plaintiffs had not provided to it complete copies of all of the exclusive location agreements purchased by Midwest, and because it questioned the validity of those agreements. [1] ¶¶ 72–73. Midwest believed that some of the exclusive location agreements did not comply with certain regulations and that some of the agreements had been forged. [1] ¶¶ 72, 78–83.

On December 7, 2012, the parties entered into a mutual release agreement, under which Midwest paid a fixed amount to settle its outstanding debt, agreed to make future payments in accordance with the scheme set out in the purchase agreements (except payment would be triggered by the installation of a video gaming terminal at a licensed establishment rather than the licensure of that establishment), and released plaintiffs from all claims under the purchase agreements. [1] ¶¶ 84–86, 103. Plaintiffs in turn released Midwest from all claims, but preserved its right to enforce the payment scheme. [1] ¶ 87.

The parties continued to operate under the release agreement for some time, but Midwest stopped making timely payments again after October 2013. [1] ¶ 104. And again, Midwest based its refusal to pay on the grounds that plaintiffs failed to deliver complete copies of all of the exclusive location agreements, that the agreements did not comply with regulations, and that the signatures on those

4

agreements were forged. [1] ¶¶ 89, 91, 93. Midwest also claimed that plaintiffs knew that the signatures were forged and failed to inform Midwest. [1] ¶ 95. Plaintiffs allege that Midwest held those concerns before entering into the mutual release agreement, and as a result, that agreement prohibits Midwest from raising them as an excuse for nonpayment. [1] ¶¶ 88, 90, 92, 94, 96. Plaintiffs sent multiple written notices of Midwest's payment obligations, which now amount to $702,676.77, to no avail. [1] ¶¶ 105–06, 110–11, 117.

Plaintiffs further allege that a number of the establishments identified in the agreements received licenses from the Gaming Board, but that Midwest failed to contact them and take the steps necessary to install video gaming terminals at their locations. [1] ¶¶ 125–129. And because Midwest's obligation to pay plaintiffs under the mutual release agreement turns upon the installation of video gaming terminals at these establishments rather than the establishment's licensure, Midwest's failure to exploit these opportunities to install video gaming terminals resulted in plaintiffs missing out on an additional $1,005,000. [1] ¶¶ 119, 128–29.

### III. Analysis

"Under Illinois law, '[t]o state a cause of action for breach of contract a plaintiff must show: (1) the existence of a valid and enforceable contract; (2) the performance of the contract by plaintiff; (3) the breach of the contract by defendant; and (4) a resulting injury to plaintiff.'" *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587

5

(7th Cir. 2001) (quoting *Hickox v. Bell*, 195 Ill.App.3d 976, 992 (5th Dist. 1990)).[2] Midwest believes that all of plaintiffs' claims must be dismissed, because the mutual release agreement (and the asset purchase agreements referenced therein) underlying those claims are illegal gambling contracts, and enforcing those contracts would be against Illinois law and public policy. Midwest argues that the gaming industry in Illinois is tightly regulated by the Illinois Gaming Board, and that individuals who have not been approved by the Gaming Board to profit from that industry should be prohibited from doing so. According to Midwest, plaintiffs have been denied a license by the Gaming Board. And because enforcing the asset purchase agreements and mutual release agreement would allow plaintiffs to profit from the gaming industry, Midwest says they should not be enforced. The premise of Midwest's argument—that the Gaming Board rejected plaintiffs' application for a license—is not alleged in the complaint. Plaintiffs object to the introduction of this fact and others that Midwest identifies in its briefs as matters of public record. Ultimately, the facts that Midwest seeks to introduce are irrelevant. Based on the allegations in the complaint alone, the validity and enforceability of the mutual release agreement is not properly alleged. The Illinois Gaming Board has exclusive, original jurisdiction to determine the enforceability of the contracts. And if the Gaming Board alone has jurisdiction to make that determination, then plaintiffs may not seek relief in federal court. *See Zahn v. N. Am. Power & Gas, LLC*, 815

---

[2] Subject-matter jurisdiction exists because the members of the plaintiff LLCs are citizens of Louisiana and South Dakota, defendant is a citizen of Illinois, and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332.

F.3d 1082, 1087 (7th Cir. 2016) ("If an Illinois state court does not have jurisdiction to hear [a plaintiff's] claim, then [the plaintiff] has failed to state a claim upon which relief may be granted in a federal court sitting in diversity.").

In *J & J Ventures Gaming, LLC v. Wild, Inc.*, 2015 IL App (5th) 140092, affirmed by *J & J Ventures Gaming, LLC v. Wild, Inc.*, 2016 IL 119870, ¶ 45, a company entered into agreements with various businesses granting it the exclusive right to place video gaming terminals in those businesses, and then assigned its rights to another entity (whose membership overlaps with the membership of plaintiffs here), who assigned them to a third entity under an asset purchase agreement. *J & J Ventures*, 2015 IL App (5th) 140092, ¶¶ 8, 11, 18. The court was tasked with determining the validity and enforceability of the exclusive location agreements and the assignments, and decided that only the Gaming Board could make such a determination. *Id.* ¶¶ 30–32, 64. The court noted that "[t]here is no common law right in Illinois to operate, profit from, or assign profits from video gaming terminals. Under the common law, gambling contracts are void." *Id.* ¶ 36. The court also described the comprehensive statutory and regulatory scheme provided by the Video Gaming Act, 230 ILCS 40/1, *et seq.*, which legalized the video gaming industry in Illinois. *Id.* ¶¶ 38–42, 45–47, 49–53. It held that the "the highly regulated nature of the statutory scheme making video gaming legal in Illinois evidences a legislative intent that the Gaming Board have exclusive authority over" the validity of agreements and assignments purporting to control the placement of video gaming terminals within a licensed establishment. *Id.* ¶¶ 30–32, 60. The

Illinois Supreme Court affirmed, and held that the validity of both the agreements and assignments could be determined only by the Gaming Board. *J & J Ventures*, 2016 IL 119870, ¶¶ 40, 44.³

Midwest does not dispute the validity of the exclusive location agreements or the assignment of plaintiffs' rights to Midwest—it takes the position that it may enforce those exclusive location agreements against licensed counter-parties, but cites to *J & J Ventures* to suggest that the mutual release and asset purchase agreements are illegal gambling contracts. Midwest seems to want to preserve its rights under the exclusive location agreements while avoiding paying for them. But putting this inconsistency to one side, Midwest's citation to *J & J Ventures* does lead to one conclusion—Illinois strictly regulates the gaming industry. The enforceability of agreements and assignments that "purport to control placement and operation of video gaming terminals" must be determined by the Gaming Board in the first instance. *See J & J Ventures*, 2016 IL 119870, ¶ 42. The exclusive location agreements that were assigned from plaintiffs to Midwest under the asset purchase agreements purport to control the placement and operation of video gaming terminals. And the mutual release agreement refers to and incorporates parts of those purchase agreements, and is related to the parties' ongoing efforts to

---

³ Plaintiffs argue that the Appellate Court's decision in *Triple 7 Illinois, LLC v. Gaming and Entertainment Management-Illinois, LLC*, 2013 Il App (3d) 120860, should control. In that case, the court held that public policy did not prohibit the assignment of an exclusive location agreement between unlicensed parties. *Triple 7*, 2013 Il App (3d) 120860, ¶ 23. But that case was decided before the Illinois Supreme Court's recent ruling in *J & J Ventures*, and its holding is neither authoritative nor persuasive.

place and operate video gaming terminals. Thus, the enforceability of the mutual release agreement can be determined only by the Illinois Gaming Board.

Because plaintiffs' claims depend upon the enforceability of the mutual release agreement, and the validity and enforceability of that agreement cannot be determined by Illinois state courts, plaintiffs have failed to state a claim upon which relief may be granted. Therefore, the motion to dismiss is granted, and the complaint is dismissed.

For the sake of completeness, I address two additional topics raised by Midwest—the implied duty of good faith and fair dealing and the accelerated payment provision of the contract.

Midwest argues that Count II, a claim for breach of implied duty of good faith and fair dealing, should be dismissed because it is premised on an independent duty that Illinois law does not recognize. Midwest is correct. "[U]nder Illinois law the covenant of good faith and fair dealing is not an independent source of duties for the parties to a contract." *Baxter Healthcare Corp. v. O.R. Concepts*, 69 F.3d 785, 792 (7th Cir. 1995) (citations and quotation marks omitted). "A breach of the duty of good faith and fair dealing is a breach of contract." *Unit Trainship, Inc. v. Soo Line R. Co.*, 905 F.2d 160, 163 (7th Cir. 1990). In their response brief, plaintiffs acknowledge that Count II is not a standalone claim and they would have to amend their complaint to state a single breach of contract claim premised on both failure to pay amounts due and failure to use reasonable efforts and good faith in installing video gaming terminals at the licensed establishments specified in the contracts.

9

Midwest also argues that no breach of the implied duty occurred here because its discretion was largely confined by forces beyond its control. But the complaint adequately alleges that Midwest had discretion—particularly in relation to the licensed establishments—that was tied to its payment obligations, and that is enough to put Midwest on notice as to the nature of plaintiffs' claim. Where one party to a contract is given broad discretion in performance, "[t]he doctrine of good faith then requires the party vested with contractual discretion to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Resolution Trust Corp. v. Holtzman*, 248 Ill.App.3d 105, 112 (1st Dist. 1993); *see also Unit Trainship*, 905 F.2d at 163. If plaintiffs could allege a valid and enforceable agreement, they could also allege a breach of the implied duty (albeit not as a standalone cause of action).

Count III of the complaint seeks enforcement of paragraph 3 of the mutual release agreement, which refers to section 4.2(f) of the purchase agreements. Under section 4.2(f), in an Event of Default, Midwest is to "immediately pay to Seller an amount equal to all unpaid Future Payments that would be required to be paid pursuant to this Section 4.2 assuming all Seller Establishments were licensed." [1-1] at 13; [1-2] at 12. And an "Event of Default" occurs when Midwest fails to make a payment due within ten days of receiving written notice that the payment is past due. [1] ¶ 133. Plaintiffs refer to section 4.2(f) as an enforceable liquidated damages clause, while Midwest describes it as an unenforceable penalty clause. A contract

provision that provides for damages under certain circumstances is an enforceable liquidated damages provision if "(1) the actual damages from a breach are difficult to measure at the time the contract was made; and (2) the specified amount of damages is reasonable in light of the anticipated or actual loss caused by the breach." *Checkers Eight Ltd. P'ship v. Hawkins*, 241 F.3d 558, 562 (7th Cir. 2001). But if "the sole purpose of the clause is to secure performance of the contract," or if "the amount of damages is invariant to the gravity of the breach," the clause is likely a penalty. *Id*. Damages provisions that fail this test will be invalidated "even if both parties are economically sophisticated." *Id*. at 563.

If the mutual release agreement were determined to be valid and enforceable by the Gaming Board, the accelerated payment clause would be an unenforceable penalty clause. Plaintiffs seek accelerated payments in the amount of $6,108,000, greatly exceeding the roughly $700,000 in actual damages that they seek under Count I. Further, the parties agree that the clause imposes a damages amount that represents plaintiffs' total potential upside under the contract—an amount that has no relation to the type of breach or actual loss resulting from the breach. And under the provision, plaintiffs may demand that amount if Midwest misses just one payment. "When a contract specifies a single sum in damages for any and all breaches even though it is apparent that all are not of the same gravity, the specification is not a reasonable effort to estimate damages; and when in addition the fixed sum greatly exceeds the actual damages likely to be inflicted by a minor breach, its character as a penalty becomes unmistakable." *Lake River Corp. v.*

11

*Carborundum Co.*, 769 F.2d 1284, 1290 (7th Cir. 1985). Because the provision imposes damages in an unreasonably high, fixed amount unrelated to the type of breach, it is an unenforceable penalty clause.

## IV. Conclusion

Midwest's motion to dismiss, [8], is granted. The complaint is dismissed without prejudice.

ENTER:

                                            Manish S. Shah
                                            United States District Judge

Date: 11/2/2016