UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AAA GAMING LLC and<br>ILLINOIS GAMING INVESTMENTS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>MIDWEST ELECTRONICS GAMING, LLC,<br><br>Defendant. | No. 16 CV 4997<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Defendant Midwest Electronics Gaming, LLC, bought from plaintiffs the rights to install video gaming terminals in certain venues, but withheld payments when some of those rights appeared to be invalid. The parties resolved their dispute by entering into a settlement agreement, but Midwest soon stopped its payments due under that contract, too. Plaintiffs filed a complaint seeking to enforce the contract between the parties. That complaint was dismissed for failure to state a claim, [21],[1] and plaintiffs' motion to vacate and alter judgment was denied. [38]. Plaintiffs filed an amended complaint, again alleging that Midwest breached the contract, and Midwest again moves to dismiss. For the following reasons, the motion is granted.

**I.  Legal Standard**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain factual allegations that plausibly suggest a right to relief. *Ashcroft v. Iqbal*, 556 U.S.

---

[1] Bracketed numbers refer to entries on the district court docket.

662, 678 (2009). The court must accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor, but need not accept legal conclusions or conclusory allegations. *Id.* at 678–79. With a 12(b)(6) motion, a court may consider only allegations in the complaint, documents attached to the complaint, and documents that are both referred to in the complaint and central to its claims. *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998).

## II. Background

The Video Gaming Act, 230 ILCS 40/1, *et seq.*, legalized the use of video gaming terminals in certain licensed establishments in Illinois. [40] ¶ 20. Defendant Midwest Electronics Gaming, LLC, is a licensed terminal operator—it was approved by the Illinois Gaming Board, an administrative agency, to operate video gaming terminals at licensed establishments. [40] ¶ 21.

On July 18, 2012, plaintiffs AAA Gaming LLC and Illinois Gaming Investments, LLC, sold to Midwest their rights under exclusive location agreements to operate video gaming terminals at 316 bars, restaurants and other establishments, once those establishments became licensed and approved by the Board. [40] ¶¶ 22–23. Plaintiffs assigned those rights under two asset purchase agreements, which established a complicated payment scheme that included payments up front, as well as future payments contingent upon the occurrence of certain events. [40] ¶¶ 43–52, 54–55, 58–69. For example, the asset purchase agreements entitled plaintiffs to certain payments when Midwest became "live" and operated video gaming terminals at a licensed establishment, or if the municipality

2

in which an establishment was located voted to approve the use of video gaming terminals. [40] ¶¶ 43, 58. The agreements also provided that an Event of Default would occur if Midwest missed a payment and failed to pay all amounts due within ten days of written notice. [40] ¶¶ 135, 157. In that scenario, Midwest would have to pay plaintiffs an amount equal to the sum of all of the future payments that would be owed under the agreements if every establishment became licensed. [40] ¶¶ 70–71.

Midwest disclosed to the Board the asset purchase agreements after they were signed, as well as the compensation paid under those agreements. [40] ¶¶ 107, 111. The Board took no action in response to those disclosures. [40] ¶ 108. But the Board did affirmatively approve Midwest's rights to operate video gaming terminals at certain establishments that were party to the exclusive location agreements assigned under the asset purchase agreements. [40] ¶¶ 109–10.

Within months of entering into the asset purchase agreements, however, the parties quarreled over payment. [40] ¶¶ 72–75. Midwest questioned the validity and completeness of the exclusive location agreements it had been assigned, and it withheld its payments. [40] ¶¶ 74–75. On December 7, 2012, the parties entered into a mutual release agreement to resolve their dispute. Under that contract, Midwest agreed to pay a fixed sum to settle the debt it had accumulated under the scheme set out in the asset purchase agreements, and it agreed to make future payments in accordance with a modified version of that scheme. [40] ¶¶ 127, 131. The parties agreed to release each other from all claims under the asset purchase

agreements, with the exception that plaintiffs preserved their rights to enforce the payment scheme. [40] ¶¶ 88–89.

Midwest continued to install and operate video gaming terminals at licensed establishments under the mutual release agreement, but in October 2013, Midwest again stopped making payments to plaintiffs, despite receiving multiple written notices of its payment obligations. [40] ¶¶ 90, 132–39. Midwest raised as grounds for nonpayment many of the same issues that it had raised before. [40] ¶¶ 90–91, 93, 95, 97. Plaintiffs allege that Midwest already released them from claims related to those issues when it entered into the mutual release agreement, and that Midwest breached that agreement by withholding payments. [40] ¶¶ 92, 94, 96, 98, 136–37. Plaintiffs also allege that Midwest breached the agreement by squandering opportunities to install video gaming terminals at licensed establishments for which it had exclusive location agreements. [40] ¶¶ 145–46. Midwest failed to maintain relationships with establishments for which it had exclusive location agreements, failed to monitor when those establishments became licensed, and failed to make good faith efforts to install video gaming terminals at those locations. [40] ¶¶ 145–46. By doing so, Midwest deprived plaintiffs of additional compensation it would have paid under the mutual release agreement. [40] ¶ 148.

The complaint also describes a January 7, 2016 agreement between the Administrator of the Board, Mark Ostrowski, and plaintiffs, Nicky Nichols (a member of both plaintiff LLC's), and several LLC's of which Nichols is a manager. [40] ¶¶ 104–05. In that agreement, which is also attached to the complaint as an

exhibit, the Board acknowledged that the asset purchase agreements had been disclosed to the Board, and that it was aware that plaintiffs had been receiving compensation and enforcing their rights under the asset purchase agreements. [40] ¶¶ 104–05. The Board also agreed to refrain from taking certain disciplinary actions that would interfere with plaintiffs' efforts. [40] ¶¶ 105–06. The complaint also alleges that the Board has a history of accepting exclusive location agreements that were assigned by unlicensed parties. [40] ¶ 123.

Midwest moved to dismiss the original complaint under Rule 12(b)(6) for failure to state a claim. [8]. In its motion, Midwest invoked *J&J Ventures Gaming, LLC v. Wild, Inc.*, 2015 IL App (5th) 140092, *aff'd*, 2016 IL 119870. Under that decision and the decision by the Illinois Supreme Court affirming it, the validity and enforceability of agreements and assignments that purport to control placement and operation of video gaming terminals must be determined by the Illinois Gaming Board. *J&J Ventures Gaming, LLC v. Wild, Inc.*, 2016 IL 119870, ¶ 42, *reh'g denied* (Nov. 21, 2016). The motion was granted because the mutual release agreement was such an agreement and its validity and enforceability had not been determined by the Board. [21]. Plaintiffs moved to vacate and alter judgment. [26]. That motion was denied. [38].

Plaintiffs amended the complaint to include allegations of the parties' communication with the Board, and the Board's past conduct. The complaint alleges a single count for breach of contract, incorporating into that claim allegations

related to the duty of good faith and fair dealing and the contract's accelerated payment clause, which the original complaint had asserted as separate claims.

## III. Analysis

### A. Subject-Matter Jurisdiction

Midwest moves to dismiss the complaint for lack of subject-matter jurisdiction, and the parties present their arguments in terms of the court's subject-matter jurisdiction over plaintiffs' breach of contract claim. But that is a mischaracterization of the issues under consideration. The parties dispute whether a state agency, the Illinois Gaming Board, has sole authority under Illinois law to determine the validity and enforceability of the contract at issue, and whether the Board has made that determination. As noted in the order on the first motion to dismiss, and in the oral ruling on the motion to vacate and alter judgment, that issue does not call into question the court's subject-matter jurisdiction. *See Zahn v. N. Am. Power & Gas, LLC*, 847 F.3d 875, 876–77 (7th Cir. 2017) ("[S]tates, including Illinois, do not have the constitutional authority to limit a district court's jurisdiction; that power lies exclusively with Congress."). Subject-matter jurisdiction exists under 28 U.S.C. § 1332(a)(1)—the parties are diverse, and the amount in controversy exceeds $75,000. [40] ¶¶ 9–12, 14, 16, 18. And no ruling issued in this action constitutes an abdication of the court's authority or duty to exercise jurisdiction and proceed to judgment.[2]

---

[2] Plaintiffs' invocation of the doctrine of abstention is similarly inapposite. The original complaint was dismissed for failure to state a claim. The court did not, and does not, abstain from exercising its jurisdiction.

The motion is more appropriately considered as one that challenges whether the complaint states a claim upon which relief may be granted. The Illinois Supreme Court has held that Illinois state courts cannot determine the validity and enforceability of certain contracts that purport to control the placement and operation of video gaming terminals, because the state legislature vested the Illinois Gaming Board with exclusive, original jurisdiction to make that determination. *J&J Ventures*, 2016 IL 119870, ¶ 42. And under Illinois law, the first element of a breach of contract claim is the existence of a valid and enforceable contract. *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001). Therefore, to state a breach of contract claim, where the contract "falls within the purview of the comprehensive statutory scheme granting the Board exclusive jurisdiction over video gaming in Illinois," *J&J Ventures*, 2016 IL 119870, ¶ 33, plaintiffs must allege that the Board determined it to be valid and enforceable. A failure to do so is a failure to state a claim upon which relief may be granted. Because the parties' arguments are directed at the merits of the claim rather than the court's subject-matter jurisdiction, the motion is more appropriately considered under Rule 12(b)(6). *See Miller v. Herman*, 600 F.3d 726, 732–33 (7th Cir. 2010) (noting that a court may treat a motion filed under Rule 12(b)(1) as a Rule 12(b)(6) motion if warranted, and collecting cases).

B.  **Failure to State a Claim**

To state a claim for breach of contract "a plaintiff must show: (1) the existence of a valid and enforceable contract; (2) the performance of the contract by

7

plaintiff; (3) the breach of the contract by defendant; and (4) a resulting injury to plaintiff." *Priebe*, 240 F.3d at 587 (quoting *Hickox v. Bell*, 195 Ill.App.3d 976, 992 (5th Dist. 1990)). The parties dispute, albeit indirectly, whether the complaint alleges the existence of a valid and enforceable contract.

Plaintiffs argue that they do not need to allege that the Board approved the mutual release agreement to show that it is a valid and enforceable contract. Relying on the same arguments raised in the motion to vacate and alter judgment, plaintiffs contend that the contract is not a use agreement that purports to control the location and operation of video gaming terminals, and is therefore outside the scope of the holding in *J&J Ventures*, 2016 IL 119870. As explained in greater detail in the order on the first motion to dismiss, *see* [21] at 7–9, and the oral ruling on the motion to vacate and alter judgment, *see* [35] at 2–4, the exclusive location agreements which plaintiffs assigned to Midwest under the asset purchase agreements purport to control the placement and operation of video gaming terminals. The mutual release agreement replaces the asset purchase agreements, modifying and continuing the payment scheme established by the latter, and governs the parties' ongoing efforts to place and operate video gaming terminals. The mutual release agreement is based on the placement of gaming terminals by Midwest and entitles plaintiffs to compensation dependent on the extent to which Midwest places video gaming terminals in certain licensed establishments. Under *J&J Ventures*, only the Board can deem such a contract valid and enforceable.

8

Plaintiffs argue that the mutual release agreement does not give them any rights to locate or operate any video gaming terminals. They say the asset purchase agreements assigned those rights to Midwest, and that the mutual release agreement is an entirely separate contract that operates as a release and termination of those agreements. While plaintiffs acknowledge that the mutual release agreement incorporates certain payment terms from the asset purchase agreements, they state that those terms are unrelated to the rights to control the location or operation of any terminals.

Plaintiffs' arguments are unpersuasive, especially in light of their theory of relief. Plaintiffs' own theory of breach is that the contract required Midwest to install certain video gaming terminals and pay plaintiffs. Midwest's failure to perform was allegedly a breach. Plaintiffs' reading of the contract, then, is that it purports to control placement of and payments derived from video gaming terminals. For the reasons listed above, and for the reasons stated in the order on the motion to dismiss the original complaint and in the oral ruling on the motion to vacate and alter judgment, the contract at issue is an agreement that purports to control the placement and operation of video gaming terminals. As such a contract, a determination of its validity and enforceability rests exclusively within the Board's jurisdiction. *J&J Ventures*, 2016 IL 119870, ¶ 38.

Plaintiffs also argue that the Board itself narrowly interpreted the Illinois Supreme Court's holding in *J&J Ventures*. The complaint alleges that the Board amended its rules in response to that decision, creating a procedure for licensed

9

establishments or terminal operators to petition the Board for a determination that a use agreement is invalid. [40] ¶ 119. The procedure allows the Board to determine: which use agreement is valid, if one establishment is party to use agreements with multiple terminal operators that cover the same time period; whether a use agreement complies with the Video Gaming Act; whether a use agreement's renewal provision constitutes an undue burden on an establishment; and whether a terminal operator used improper means to persuade an establishment to enter into or renew a use agreement. But plaintiffs cannot make use of this procedure because they are neither terminal operators nor licensed establishments. Plaintiffs argue that because the emergency amendment that the Board enacted in response to *J&J Ventures* does not provide plaintiffs with a mechanism to obtain Board approval, the Board has signaled that determining the validity of the mutual release agreement is outside of its jurisdiction.[3]

Plaintiffs overstate the significance of the Board's interpretation—representations by the Board and information relating to its procedures "do not control the determination of the Board's jurisdiction, which is a judicial function and not a question for the agency itself." *J&J Ventures*, 2016 IL 119870, ¶ 41. Under *J&J Ventures*, the mutual release agreement falls within the category of agreements whose validity and enforceability must be determined by the Board. If

---

[3] Plaintiffs also note that the procedure established by the emergency amendment is unhelpful because it does not provide the relief that plaintiffs seek—monetary damages. However, as discussed above, plaintiffs need only obtain a determination of validity and enforceability from the Board. Once the Board approves the contract, plaintiffs may enforce it elsewhere. Plaintiffs can, for example, look to this court to adjudicate a breach of contract action and recover monetary damages.

the Illinois Supreme Court intended a narrower holding, then the Illinois Supreme Court may provide clarification. Whether the Board provides plaintiffs with a procedural path to implement the holding in its current form is a separate issue.

The additional facts alleged in the amended complaint do not cure the deficiency identified in the earlier opinion. Plaintiffs do not allege that the Board approved the mutual release agreement. The complaint includes allegations of the Board's past conduct—its approval of, or at least lack of objection to, other agreements that have come before it. Plaintiffs suggest that that conduct either constitutes approval of enough of the constituent parts of the mutual release agreement sufficient to show that the mutual release agreement is a valid and enforceable contract, or that it guarantees that the Board would approve of the contract if given the opportunity. The allegations are insufficient to show that the mutual release agreement was in fact approved by the Board, and even if plaintiffs could establish a high probability of a favorable decision by the Board, that does not obviate the need to submit the contract for Board approval.[4]

Plaintiffs object to the inconsistency in Midwest's position that the mutual release agreement's validity has not been alleged. Midwest does not contest the validity of the underlying exclusive location agreements or their assignments, and in a different case, AAA and Midwest appeared together as defendants and argued

---

[4] Midwest also argues that the complaint does not plausibly allege that the mutual release agreement contains an implied duty of good faith and fair dealing. As discussed in the order on the first motion to dismiss, Illinois courts read that duty into every contract as a matter of contract interpretation. *See Dayan v. McDonald's Corp.*, 125 Ill.App.3d 972, 989–90 (1st Dist. 1984) (a covenant of good faith and fair dealing is implied into every contract unless expressly disavowed). Because Midwest does not identify any provision in the agreement expressly disavowing that duty, the complaint plausibly alleges that such a duty exists.

11

in favor of the validity of a similar assignment of exclusive placement rights. But the mutual release agreement is a different contract, as plaintiffs note elsewhere in their brief, and one whose validity is not adequately alleged. Plaintiffs do not state a claim for breach of that contract. Therefore, the motion to dismiss is granted.

## IV. Conclusion

Midwest's motion to dismiss, [41], is granted. The complaint is dismissed for failure to state a claim. The parties shall appear for a status hearing on February 2, 2018, at 9:30 a.m.

ENTER:

_____

Manish S. Shah
United States District Judge

Date: January 26, 2018